WR-56,666-03
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/22/2015 9:46:41 AM
Accepted 12/22/2015 10:41:01 AM
ABEL ACOSTA
CLERK

# IN THE COURT OF CRIMINAL APPEALS
## FOR THE STATE OF TEXAS
### AUSTIN, TEXAS

RECEIVED
COURT OF CRIMINAL APPEALS
12/22/2015
ABEL ACOSTA, CLERK

| | | |
|---|---|---|
| **EX PARTE** | § | |
| | § | |
| | § | **NO. WR-56,666-03** |
| | § | |
| | § | |
| **DENNIS LEE ALLEN** | § | |

# IN THE COURT OF CRIMINAL APPEALS
## FOR THE STATE OF TEXAS
### AUSTIN, TEXAS

| | | |
|---|---|---|
| **EX PARTE** | § | |
| | § | |
| | § | **NO. WR-82,467-01** |
| | § | |
| | § | |
| **STANLEY ORSON MOZEE** | § | |

## CAUSE NOS. F99-02631-R, F00-01305-R
## WRIT NOS. W99-02631-R(A) and W00-01305-FR(B)

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| | § | **203RD JUDICIAL DISTRICT** |
| **STANLEY ORSON MOZEE** | § | |
| **and** | § | |
| **DENNIS LEE ALLEN** | § | **DALLAS COUNTY, TEXAS** |

## EXHIBIT IN SUPPORT OF
## APPLICATIONS FOR WRITS OF HABEAS CORPUS

**TO THE HONORABLE JUDGES OF SAID COURT:**

**NOW COMES** DENNIS LEE ALLEN and STANLEY ORSON MOZEE,

Applicants, and submit this Exhibit in Support of Applications for Writs of Habeas Corpus.

Exhibit in Support of Applications for Writs of Habeas Corpus - Page 1

The exhibit is the Oral Deposition of John Paul Robinson

Respectfully submitted,

GARY A. UDASHEN
Bar Card No. 20369590

BRUCE ANTON
Bar Card No. 01274700

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas 75201
214-468-8100
214-468-8104 fax
Appearing on Behalf of the Innocence Project of Texas
*Counsel for Dennis Lee Allen*

NINA MORRISON
INNOCENCE PROJECT, INC.
40 Worth Street, Suite 701
New York, New York 10013
212-364-5340
212-264-5341 fax

EZEKIEL TYSON, JR.
Bar Card No. 24034715
THE TYSON LAW FIRM
342 W. Montana Avenue
Dallas, Texas 75224
214-942-9000
214-942-9001 fax
*Counsel for Stanley Orson Mozee*

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of December, 2015, a true and correct copy of the above and foregoing Exhibit in Support of Applications for Writs of Habeas Corpus was hand-delivered and electronically delivered to the Dallas County District Attorney's Office.

GARY A. UDASHEN

REPORTER'S RECORD

VOLUME 01 OF 01

WRIT NOS. W99-02631-R(A) & WOO-01305-FR(B)

| | |
|---|---|
| EX PARTE | ) IN THE 203RD JUDICIAL |
| | ) |
| | ) |
| | ) |
| | ) DISTRICT COURT OF |
| | ) |
| STANLEY ORSON MOZEE | ) |
| and | ) |
| DENNIS LEE ALLEN, | ) DALLAS COUNTY, TEXAS |

------------------------------------

WRIT OF HABEAS CORPUS

------------------------------------

ORAL DEPOSITION OF JOHN PAUL ROBINSON, produced as a witness at the instance of the Co-Applicants and duly sworn, was taken in the above-styled and numbered cause on December 4, 2015, from 10:10 a.m. to 11:15 a.m., before Karen L. D. Schoeve, CSR, RDR, CRR, in and for the State of Texas, reported by computerized machine shorthand, at the Mark W. Michael Unit, 2664 FM 2054, Tennessee Colony, Texas, pursuant to the Texas Rules of Criminal Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE CO-APPLICANTS:

GARY A. UDASHEN, ESQUIRE
SORRELS | UDASHEN | ANTON
2311 Cedar Springs Road, Suite 250
Dallas, Texas 75201
T: 214.468.8100
F: 214.468.8104
gau@sualaw.com

**FOR THE RESPONDENT:**

PATRICIA CUMMINGS, ESQUIRE
CONVICTION INTEGRITY UNIT
Special Fields Bureau Chief
Criminal District Attorney's Office
Dallas County, Texas
Frank Crowley Courts Building
133 N. Riverfront Building, LB 19
Dallas, Texas 75207-4399
**T:** 214.653.3612
**F:** 214.653.2924
Patricia.Cummings@dallascounty.org

**ALSO PRESENT:**

Lt. James Hammond
Investigation Division
Criminal District Attorney's Office
Dallas County, Texas

Erica Redic, CO-4
Mark W. Michael Unit
Tennessee Colony, Texas

**THE COURT REPORTER:**

Karen L. D. Schoeve
Certified Shorthand Reporter
Certified Realtime Reporter
Registered Diplomate Reporter
Realtime Systems Administrator

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

INDEX

                                                                PAGE

Appearances                                                       2


JOHN PAUL ROBINSON

        Examination By Mr. Udashen                                4
        Examination By Ms. Cummings                              22
        Further Examination By Mr. Udashen                       64


Reporter's Certificate                                           68




                        EXHIBIT INDEX

NO.   DESCRIPTION                                               PAGE

(No exhibits marked.)

P R O C E E D I N G S

JOHN PAUL ROBINSON,

having been first duly sworn, testified as follows:

EXAMINATION

**BY MR. UDASHEN:**

Q. Okay. Would you state your name, please.

A. John Paul Robinson.

Q. And, Mr. Robinson, just so the record's clear, we are currently in the Michael Unit of the Texas Department of Criminal Justice, and you are an inmate here in this unit; is that correct?

A. Yes, sir.

Q. And you are -- how long of a sentence are you serving here now?

A. 25 years.

Q. Okay. And that's out of Dallas County?

A. Yes.

Q. All right. And it's an aggravated sexual assault; is that correct?

A. Yes.

Q. Okay. So how long have you been locked up on that particular case?

A. Almost four years.

Q. Okay. Now, I want to direct your attention back to the year 2000 -- and first of all, just so the

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

record's clear, I am appearing on behalf of Dennis Lee Allen, and I'll also be asking questions on behalf of Stanley Mozee. So this case involves both of them.

So I'm going to direct your attention back to the year 2000 and the year 1999.

Now, you know Dennis Allen.

A. Yes, I do.

Q. Do you know Stanley Mozee?

A. No, I don't.

Q. Okay. So tell us how you know or knew Dennis Allen.

A. We were on the same tank together. I had a club -- I had a club down the street from a place he used to be at, he used to frequent, so we kind of met up inside the county jail.

Q. Okay. So you knew him a little bit before you went to -- you were in jail?

A. I just knew of -- I knew the area. We both knew a mutual area because I had a nightclub there.

Q. Okay. And that nightclub, is that is that old Forest Avenue Theater?

A. Yes.

Q. So you were one of the owners of that club?

A. Yeah. I was the owner.

Q. You were the owner?

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

A. Yeah.

Q. And what years were you the owner of that?

A. I owned it from '98 until 2000.

Q. Okay. So you didn't really know Dennis, you just saw him around there.

A. Yeah. Yes.

Q. Okay. So where you really got to know Dennis, or where you really wound up even talking to him was when you-all were in jail.

A. In the county jail.

Q. Okay. So let me direct your attention back to around '98, '99. So when did you -- you were not in jail, at least at some point during that time period.

A. No.

Q. And at some point you got moved to Dallas County Jail.

A. Yes.

Q. I'm sure you don't remember the exact date, but do you remember about when you got put into the jail?

A. No, I don't. I don't remember the exact date or -- not even really the month.

Q. Okay. But you --

A. I believe it was kind of -- I believe it was in the wintertime, though.

Q. Okay. You remember you had a '98 arrest for

Electronically signed by Karen Schoeve (001-182-274-8899)                     89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

burglary of a habitation.

A. Yes.

Q. And that's what you were in jail for when you met --

A. The violation.

Q. So you got -- you had a -- well, you had a burglary of a habitation.

A. Um-hum.

Q. And that's the case you were actually in jail on --

A. Yes.

Q. -- when you were in the tank with Dennis?

A. Yes.

Q. So you -- tell us how y'all wound up in the same tank.

A. I mean, I don't know. They just -- I guess we were classified together. They put us in the same tank.

Q. Okay. Were you there first and then he came in?

A. Yeah, I believe so. I believe I was there first.

Q. Okay. Now, it's my understanding that at some point you and Dennis got into -- actually got into a fight.

A. Well, we had a -- we had a discussion. At

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

first we was just, you know, doing the normal thing how people talk about their cases, try to help each other out -- then just try to help each other out or whatever.

And that went on for a while, and then we kind of semi had words after that, you know, somehow --

Q. Okay. So what were y'all having words about?

A. I don't exactly remember. I remember him feeling that -- I remember him feeling that -- at one point in time that people were against him. And it was kind of common to feel like the person that you've been talking to the most may be one of the people against you, or whatever. And plus, the authorities, they had pulled me out a couple of times.

Q. Okay. They had pulled you out a couple of times --

A. Yes.

Q. -- for what?

A. I mean, I don't want to lie exactly. But I know at one point in time they pulled me out and asked me about Dennis.

Q. Okay.

A. And I didn't know anything, or I didn't know what they wanted to know.

Q. Okay. So let's back up.

The first time that the authorities pulled

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

you out, do you remember who it was that pulled you out?

A.   No, sir, I don't.

Q.   Was it a police officer or district attorneys, prosecutor?

A.   I think it was a detective or something.

Q.   So he pulled you out and asked you if you knew anything about Dennis.

A.   Yes.

Q.   Why would he have pulled you out and asked you that?

A.   I think it was because my club was in the same vicinity as this crime took place.

Q.   Okay.  So he asked you if you knew anything about Dennis, and -- I mean, I guess he's asking if you knew anything about Dennis and what Dennis was charged with?

A.   Yes.

Q.   And you told him you didn't.

A.   Yes, but I told him that I knew the man.

Q.   And the man was the man that got killed?

A.   The leather shop preacher.

Q.   Okay.  Do you remember his name?  Reverend Borns, does that sound right?

A.   We just used to call him "Rev."

Q.   Rev.  Okay.

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

A. Everybody called him "Rev."

Q. So you told the detective you knew the man, the reverend, that got killed --

A. Yes.

Q. -- but you didn't know anything about Dennis being involved?

A. No, not at that time. He didn't even say his name. He just asked me did I know anything about what had happened. But, you know . . .

Q. Okay. So he wasn't even asking about Dennis at that time.

A. No.

Q. The detective?

A. Yes.

Q. So you think he just called you out because you had a business in the same neighborhood?

A. He let me know -- as I gave thought to it after the last time I talked to you, he let me know that I was in the midst of somebody who possibly had something to do with it.

Q. Okay. Did he tell you it was Dennis he was talking about?

A. No.

Q. Okay.

A. I put that together myself after he and I

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

talked.

Q. Okay. But at that point you didn't know it was Dennis?

A. No.

Q. So after -- okay. So after you had this conversation with the detective, did you take any action or do anything as a result of that conversation?

A. I talked to Dennis another time or two. This was before we had our differences.

Q. Okay.

A. I talked to him another time or two, and I figured out that what they were questioning me about was his case.

Q. Okay. And you started asking questions about his case?

A. Well, I mean, I already knew some of the things, like I said, that he and I had talked about. I already knew some of the things.

Q. Okay. Now, you testified at Dennis's trial. Do you remember that?

A. Yes.

Q. And at Dennis's trial, you testified that Dennis had told you some things about him being involved in killing Reverend Borns.

A. Yes.

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

Q. Do you remember that?

A. Yes.

Q. Did Dennis tell you those things?

A. No, he did not.

Q. Okay. So why did you testify that he did?

A. Actually they took some things that I had said about my place and made it sound like that what I told them was something familiar to what he had done. See, my building was on the corner.

Q. Um-hum.

A. And when things used to happen, like when somebody get chased by the cops, they would throw stuff on the building. And I would always find stuff on the building.

Q. Okay.

A. So they asked me, you know, did I know anything about anything being thrown on the building. I don't know if they had talked to anybody else in there or not or whatever. But, you know, he was telling me, "Well, you know you could go to the penitentiary for this. We just -- you don't have to say that you seen him kill anybody," because I wasn't there and I didn't, you know what I'm saying?

And he said: Well, we just need to know that if he told you this, that, or the other. Meaning,

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

if he ever threw something on the building, if he even knew the guy or whatever.

Q. Okay. So this is the detective you're talking to?

A. Yes.

Q. Okay. Did the detective give you -- tell you what would be done for you if you were able to help them?

A. Yes. He said that -- he said that he would make sure I would be all right in my court.

Q. Okay. And the detective said he would make sure you would be all right in your court --

A. Yes.

Q. -- if you were able to give them some information about Dennis?

A. Yes.

Q. Okay. And so is that the reason why you told them the things about Dennis?

A. Yes.

Q. Okay. So let me back up for a minute.

So the things you testified to in trial that you said Dennis told you about, his alleged involvement in killing Reverend Borns, I think you said Dennis did not tell you the circumstances.

A. No, he did not.

Electronically signed by Karen Schoeve (001-182-274-8899)       89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

Q.    Okay.   So that was not true what you testified to?

A.   No, they kind of gave me -- the guy kind of gave me a layout of what to say or whatever.

Q.   Okay.   Was this the same man that you saw when you got --

A.   Yes.

Q.    -- brought down?

A.   Yes.

Q.   So you kind of got the picture of what they wanted you to say.

A.   Yes.

Q.   Okay.   Now, you were talking about things being thrown on the roof.   Tell me -- tell us about that.

A.   He brought up -- he said that it was supposedly some stuff missing.   And I told him, like, on my buildings, I have found guns, knives, phones, all kinds of stuff like that.

Q.   On your roof?

A.   On my roof.

Q.   Okay.   That people throw stuff up on the roofs over there.

A.   Yeah, because there's nowhere to run.   Once they run you in the corner where my building was, there's nowhere else to go, you know, so . . . .

Electronically signed by Karen Schoeve (001-182-274-8899)              89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

Q.   So you told the detective that in that neighborhood people would throw stuff up.

A.   Yes.  And they switched it around, you know.  And it was like at the end of the road.  Like, I had told him that Dennis said that he threw something on the roof.

Q.   Did Dennis say that?

A.   No.

Q.   So you had a burglary -- you were in jail on a burglary of a habitation case when all these conversations were going on, correct?

A.   Yes.

Q.   And at some point you had a jury trial on that case.  Do you remember that?

A.   Yes.

Q.   And had a hung jury.

A.   Yes.

Q.   Okay.  Now, that was -- you had been to the penitentiary how many times before?

A.   Once.

Q.   One time before that?

A.   Yes, aggravated robbery.

Q.   So you'd been down for aggravated robbery.

A.   Yes.

Q.   And so then this -- and you understand that

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

burglary of a habitation was another -- is enhanced.

A. Yes.

Q. So you had a hung jury, and then you started having these conversations.

A. Yes.

Q. Am I right on kind of the time frame?

A. Yes.

Q. All right. So you had these conversations with the detective. And then at some point you came to court and actually testified in Dennis Allen's trial.

A. Yes.

Q. Now, before you testified, do you remember talking to the prosecutor also?

A. Yes. In the window, the lawyer -- the detective and -- yes, the detective and the prosecutor -- the DA.

Q. The DA?

A. Yes.

Q. Are you talking about you were in the holdover --

A. Yes.

Q. -- next to the courtroom?

A. Yes.

Q. All right. So he went over -- the prosecutor went over with you what he was going to ask you in

court?

A. Yes. What he was gonna say. What it would be best for me to say.

Q. **Okay. Tell us about that conversation.**

A. Just to answer his questions, and he wrote down the reply -- the best reply would be for me to give without saying too much. He was telling me that it was basically the same thing I had told him. He just, like, narrowed it down.

Q. **Okay. And if I understand what you're saying is the whole reason you did all this, you told the story in court was because they told you they were gonna help you with your case.**

A. Yes.

Q. **All right. So you went to court and you testified. And then after you went to court, is it your understanding that the DA got -- got you an offer of probation on your case?**

A. Yes, probation.

Q. **So they were not offering you probation for your testimony?**

A. No. I believe it was like six years at that time.

Q. **Okay. So after you testified, then they offered you probation.**

Electronically signed by Karen Schoeve (001-182-274-8899)     89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

A. Yes.

Q. And that's what you expected them to do as a result of your testimony?

A. Yes.

Q. Okay. So they did what they told you they were going to do?

A. Yes.

Q. All right. So then you got probation, and did you get out of jail?

A. Yes.

Q. But then at some point you're probation got revoked?

A. Yes.

Q. All right. So after your probation got revoked, how much time did you do on that parole violation?

A. Four years.

Q. Do you remember when you got out?

A. No -- three years from 2002 until 2005.

Q. So you got out in 2005?

A. December 30th, 2005.

Q. Okay. And then how long were you out before you got arrested again?

A. Until 2011 -- December 29th, 2010, I'm sorry.

Q. And that's the case you're down on here now?

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

A.   Yes.

Q.   So this is -- actually you're here on your third trip; is that right?

A.   Yes.

Q.   Now, have you ever -- have you had any conversations with Dennis Allen or Stanley Mozee at all about this?

A.   No.

Q.   And I got in contact with you to ask you about this --

A.   Yes.

Q.   -- is that right?

A.   Yes.

Q.   Now, were there any other cases besides the case with Dennis Allen that you gave the police or the DA statements on in an attempt to get them to help you with your case?

A.   No.  Not as far as a situation like this.  They had -- I was the -- I was the photographer in 2009 and 2010.  At a place where I was filming a music video, a guy was killed, and they used my videos.

Q.   Okay.

A.   And I had to testify to being -- to being the -- videographer of that project.

Q.   Okay.  But that was --

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

A. That was in 2008/2009.

Q. But you never made a deal with the DA --

A. No.

Q. -- to get you off on another case?

A. No.

Q. Now, you and Dennis got into a fight at some point.

A. Yes.

Q. Okay. So what did y'all get into a fight about?

A. I believe -- I believe he felt as if somebody had questioned -- he felt as if I had questioned him in-depth about his case. Which, if that happens, in most cases when people are locked up, they feel like somebody is telling on them or somebody is getting information for the authorities.

Q. Okay. So he thought you were trying to get something?

A. Yes.

Q. So y'all got in a fight?

A. Yes.

Q. As I understand it, neither one of -- I mean, you didn't report it?

A. No.

Q. And they didn't report it?

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

A.   No, they just moved us.

Q.   **Okay.  But then you got called down after that fight happened?**

A.   Yes, that was the next day.

Q.   **By the same detective?**

A.   Yes.

Q.   **Okay.  And tell us about that meeting when you got called down by that detective.**

A.   He said that he knew about it.  Which I don't know how he knew about it, but he said that he knew about it.  I believe that the center part of the things was that it really wasn't about Dennis.  It was about the preacher guy being, quote/unquote, "a good person, a person that would help anybody."

I think that's the way he came to me at first, and that was the reason -- being from -- from -- from the time I accepted the deal, you know, because this was somebody who wasn't involved in the legal and so forth.  I didn't feel like he deserved to die.

Q.   **Okay.  So basically the detective told you and you agreed that the Reverend was a good guy.**

A.   Yes.

Q.   **And did he --**

A.   Because I knew him, too.

Q.   **Because you knew him, too, okay.**

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

A.   Yeah.

Q.   But just to clarify your testimony about what Dennis said, that was not true?

A.   Exactly.

Q.   And they also asked -- you remember in trial, the prosecutor asked you questions about whether or not you had been offered any kind of deal on your own case?

A.   Um-hum.

Q.   And you said "no."

A.   Yes.

Q.   That also wasn't true, right?

A.   Exactly.

Q.   Okay.

          MR. UDASHEN:   I'll pass the witness.

                    EXAMINATION

BY MS. CUMMINGS:

Q.   Okay.  So I have a few questions.  And depending on how you answer them, it may make it turn into a few more questions, just to warn you, okay.

          I introduced myself to you before we started the deposition, right?

A.   Yes.

Q.   So you know my name is Patricia Cummings, and I'm a prosecutor with the Dallas District Attorney's Office.

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

A.    Um-hum.

Q.    And I work for the Conviction Integrity Unit.

A.    Um-hum.

Q.    We talked about that, correct?

A.    Yes.

Q.    And you understand what the Conviction Integrity Unit is, Mr. Robinson?

A.    Yes.

Q.    Tell me what your understanding of it is.

A.    They get the depth of things, the truth of the it, the focal point.

Q.    Is there anything more, any kind of particular case that we look at in the Conviction Integrity Unit? I'm just really trying to get a feel for how well you understand what we do.

A.    They look at both sides of the people that testify.

Q.    So in situations where somebody's already been convicted of a crime?

A.    Yes.

Q.    And you understand, as a prosecutor with the Conviction Integrity Unit, I'm not here today looking at you as a suspect in any crime.

A.    Yes.

Q.    In fact, we talked about, before we started

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

this deposition, that I was here to try to find the truth about Dennis Allen's case and Stanley Mozee's case.

A. Yes.

Q. So when I asked you questions, it's regarding that and only that.

A. (Witness nodded head.)

Q. Do you understand?

A. Yes.

Q. I'm real curious. Kind of my starting point, I'm just curious as to your memory, and why it is you remember so much about Dennis Allen's case.

Can you tell me a little bit about that, help me understand.

A. Well, I mean, it was a -- it was a big thing on our -- in our neighborhood where I owned my club at, you know, when the preacher got killed. So I guess after being -- after thinking about it for a while, you know, I was just -- a little bit comes here and there.

And I had talked to this guy, Gary, like about two weeks ago, I believe -- or maybe -- and ever since -- and he told me that I would probably either be called back or somebody would or you guys would come and see me, so I just tried to remember as much as I could of what happened.

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

Q. So you're saying because the murder of Reverend Borns was important, that's part of the reason why you were in the -- (overlapping speakers).

A. Yes.

Q. Is it also accurate to say you remember about this case because you actually testified --

A. Yes.

Q. -- against Mr. Allen?

A. Well, yeah, that too.

Q. And I would think that for somebody like you, who's been to prison before, and who is sitting in prison now, that when you testify against somebody, that is a big deal.

A. Yes.

Q. And it's not necessarily a big deal because it's a good thing, right?

A. Yes.

Q. I mean, you have certain worries and concerns when you're inside as to how you will be treated if it was known that you were a snitch against somebody.

A. Well, it's not -- that's not really the -- that's not really the case to me in this because I was a business owner, and I wasn't -- I wasn't in the -- I wasn't in illegals. So when you're not in illegals, and you're just doing whatever you're doing for your

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

community, it's not the same thing as being in illegals, and you telling on somebody who you doing something illegal with. So, no, it wouldn't be such a big thing.

Q. I understand. And I think that in looking at your records, my memory is that when you had gone down to prison the first time on the aggravated robbery, you were pretty young when that happened, right?

A. Yes. 18.

Q. Right. And then you had a pretty big, significant chunk of time when you went down on that robbery versus when you were in jail again visiting with Mr. Allen.

A. Yes.

Q. And so is it fair to say that kind of in that in between time period you were trying to get your life right --

A. Yes.

Q. -- and have a legitimate business?

A. I was. I had a business.

Q. Okay. What was the name of the club that you owned?

A. It was called -- at first it was called Dallas Night when I went into a partners with a person. Then when I got it from him, I changed the name to City Lights.

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

Q. And what you told Gary just a few minutes ago is that you owned that club from 1998 to around the year 2000.

A. Yes. It's the Old Forest Theater.

Q. And you're sure about those dates? And the only reason I'm asking, it's not a trick question. But on the burglary of a habitation that you were in jail on when you were talking to Mr. Allen, the date that that crime supposedly occurred was in 1998.

A. Um-hum.

Q. But then you were in and out of jail between '99 and 2000.

A. Yeah. I had the club at first in partnership with somebody.

Q. Okay. And did you keep the club --

A. Yes.

Q. -- even while you were in jail --

A. Yes.

Q. -- for that burglary of a habitation?

A. Yes. The dude that I was in partnership with, we were going to (inaudible).

Q. Do you mind telling me who that person was that you were in partnership with?

A. Keith Thomas.

Q. Okay. And Gary asked you about when you went

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

to jail on the burglary of a habitation, and it seemed to me that there was a little confusion.  So I just want to be clear about a couple of things.

From looking at your file, what I can tell happened is that you got arrested on that charge, and it looks like you bonded out at one point.  And then later had a bond forfeiture for missing court.

Do you remember any of that?

A.   I don't remember how it went.

Q.   Okay.  You know you were kind of in and out before that case ever got resolved?

A.   Yes.

Q.   Okay.  You had, also, a girlfriend at the time that you testified against Mr. Allen?

A.   Danielle Warren.

Q.   That one's not the one that rings a bell to me.  Do you remember any other girlfriend that you were seeing?

A.   Felicia Coleman.

Q.   Keep going.

A.   Destiny Washington.

Q.   Keep going.

A.   Denise Cooper.

Q.   Maybe I should give you some help here.

When you testified in Mr. Allen's trial,

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

you testified that you were seeing a girl or it was your girlfriend around the time of the trial, and that she would come visit you.  Y'all weren't necessarily talking on the phone, but she'd come visit you, and you actually released some of your property to her when you were in jail.

Last name Brown.  I guess you called her "Chocolate."

A.  Ysekia Brown, Chocolate, yeah.

Q.  And can you tell me, were you dating her before you went into jail, or was this somebody that just started coming to see you in the jail?  Tell me a little bit about that relationship.

A.  That part of my life was wild (laughing).  I mean, actually I, like, had a couple of females.  We lived in the house together.

Q.  Okay.  During this time period when you were going in and out of jail?

A.  Yes.

Q.  I want to ask you some real specific questions about her, just in regard to releasing some of the property.

So do you know what I'm talking about when I say that?

A.  Umm.

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

Q.  Do you even know which girl --

A.  Let me see if I -- car keys, phone, wallet, maybe stuff like that.

Q.  Are you just guessing?

A.  I mean, it's probably what I would have on me when I get arrested -- when I got arrested.

Q.  And why would you release it to her?  Do you remember why you would have released anything?  And I'm not even saying I know for sure what all you released.  But why would you release it?

A.  Probably because she was one of the ones that I probably trusted the most.

Q.  So what do you mean "trusted"?  Did you think that you needed to release it because it wasn't safe to keep those kinds of belongings in the jail or -- you see what I'm saying?

A.  I don't remember exactly what it was that I released to her other than -- I know I gave her money from jail.  I don't remember exactly what it was.  If I knew, then I would probably remember exactly the reason why.  I mean, like I say --

Q.  How about a pager?  You're releasing a pager to her?

A.  Yeah, probably would have been.

Q.  Now that you know what it was, does that help

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

you remember why you might have released a pager to her?

A. No.

Q. And a cell phone, same question?

A. I don't remember exactly why.

Q. Okay.

A. But like I say, she would have been one of the ones that I would have trusted the most out of the females that I was seeing because she was stable. She wasn't in -- like street savvy or nothing like that.

Q. Did you -- after you testified against Dennis Allen, did you keep up any kind of relationship with her?

A. Yes, actually we did.

Q. Do you know how long?

A. Until now.

Q. Wow, okay. So you still talk to her?

A. Yeah, every now and then when I get a chance.

Q. I'm guessing -- and I could be wrong here -- but I'm guessing back at the time all of this was going on and you're talking to the detectives about the Reverend's murder and you're getting ready to testify against Dennis Allen, I'm guessing you probably would have talked to her a little bit about what was going on?

A. No.

Q. You wouldn't have talked to her at all about

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

it?

A. No.

Q. And why do you say that?

A. She has nothing to do with the street. That's just not -- that's just not something to do with her. It's not something I would have done.

Q. Do you remember her ever saying anything to you that the prosecutor in Dennis Allen's case actually called her and talked to her?

A. If she did, we didn't discuss it. If she did, she may have said it and just didn't discuss it or whatever. You know, I don't think she had anything to do . . .

Q. And not I'm thinking she did anything wrong, so don't get me wrong here.

I'm just wondering, as we try to investigate what you're saying --

A. Um-hum.

Q. -- what I'm trying to figure out, if there's other people that I could talk to --

A. Um-hum.

Q. -- that would help me confirm what you're saying is the truth. Does that make sense?

A. Yes.

Q. And that's really important from my point of

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

view because -- and I got to be honest with you, and I'm not trying to insult you or blow smoke or anything like that.

A. I understand.

Q. But you've got to understand, a lot of people, if they read what she types up that you said today, they're going to be skeptical about whether or not you're telling the truth.

A. Um-hum.

Q. And so, as you said, what my job is is to try to figure out what the truth is. So I want to investigate, and I want to see if there's any way that I can find some evidence, some person, who's going to support what you're saying.

A. Um-hum.

Q. And so that's why I'm asking you the questions about Miss Brown.

So does that make you feel a little better about me asking these questions --

A. Oh, I mean --

Q. -- and does it change any of your answers?

A. No.

Q. I mean, do you think it's possible she might know something?

A. She is -- I mean, as far as about -- as far as

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

about the murder --

Q.   Not so much about the murder, but about --

A.   About anything that I may have told her?

Q.   -- about you testifying against Dennis Allen and about the pager and about the cell phone.

A.   No, I don't think so.

Q.   What do you think about me trying to call her? Do you think she'd talk to me?

A.   I mean, with my -- I mean, you have my consent, you know.

Q.   That's helpful.  Because if I'm able to tell her that you said, "Yes, it's okay to talk to her," then maybe she might remember something that you're not remembering, right?

A.   Yeah.

Q.   Can you tell me how I might find her?

A.   I know she just recently got married a few months ago, so we kind of, like, hear from each other through other people.

Q.   Does she live in Dallas?

A.   Yes.

Q.   Do you mind telling me how to spell her name? Do you know how to spell her first name?

A.   Y-s-e-k-i-a.  I mean --

Q.   Y --

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

A. Yeah. Y-s-e-k-i-a.

**Q. Ysekia.**

A. Her maiden name was Donaldson. But she -- like I said, she just recently got married, so I don't know what her last name is as of now.

**Q. Okay. That's helpful. We'll try to find her.**

**Let me ask you a few questions about the Reverend. I want to be real clear in understanding what you said today.**

**You knew him?**

A. Yes.

**Q. Did you know him well?**

A. Yes. Well, no, not like -- not like just best friends or whatever. But everybody knew that they could borrow a few dollars from him or everybody knew that they could go get tools. You know, he had a little shop that kind of, like, had all kind of stuff in it, you know.

**Q. And that shop was real close to the club --**

A. Yes.

**Q. -- that you were running and co-owning with Mr. Thomas?**

A. Keith Thomas, yes.

**Q. Right. How close was it?**

A. Probably a couple of blocks.

Q. I've got some photographs that were taken back at the time when you helped the prosecutor and the police find the knife on the roof.

A. Yeah.

Q. I'm going for show them to you. I'm not going to introduce them as part of this deposition or anything, but I'm just trying to understand where the Reverend's place was in relation to where your club was, and these photos may not even show either one.

A. Um-hum.

Q. But will you take a look at them and help me out if they do?

A. Um-hum.

Q. And so is this the area? I'm going to show you several at a time because that may make it easier.

What about that (indicating)?

A. Yes.

Q. So tell me, what is that?

A. This is -- Malcolm X Boulevard is, like, to the left, Blackjack's Pizza and all of that. And that's on one side of 45 (indicating).

Q. Do these help?

A. Yeah.

Q. So I'm guessing that what happened was --

A. I think this would be the top of the --

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

Q. The roof?

A. -- the roof of the building right there (indicating).

Q. And when you say "the top of the roof of the building" --

A. Reverend Borns -- close to Reverend Borns' place.

Q. How close to your club?

A. Like right down the street. It's on the corner of 45. Interstate 45 and Martin Luther King.

Q. So that might help a little bit. So that's the Fox Triumph Club?

A. Yes.

Q. And then this is the roof that you were just talking about?

A. I believe that his shop was to the right of that, looking at the building.

Q. And you think -- is that one of the actual roof itself?

A. Yes.

Q. Were you with the police or the prosecutor or anybody to go out there --

A. No.

Q. -- and show them and help them find that knife?

A. No.

Q. So you just basically told them what about possibly finding something on the roof?

A. That they -- that -- when I explained to him about when something happens around my area, that I would find things on the roof. And so he said that was a, I believe, helpful or -- you know.

I don't know if he said that he had found something on the roof then, or I don't know if he went after that and found something on the roof, because I would be lying, you know. But I know something to that nature.

Q. So based on what you're saying then, the detective or the prosecutor, nobody ever came back to you and showed you a knife --

A. No.

Q. -- and asked you questions about it?

A. No.

Q. I'm a little confused also about your testimony about how it was that you supposedly gave this statement to the police about Dennis Allen's involvement in the Reverend's murder, okay? I'm just a little confused, so I'm going to ask you some questions about that just to clarify it, okay?

A. Um-hum.

Q. So I understand that you have said that a

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

detective came to you --

A. Um-hum.

Q. -- and just started asking questions in general about, "Hey, we know you owned this club, and it's close to the Reverend's business. Do you know anything about the murder?"

Is that how it all started?

A. Pretty much.

Q. "Pretty much." So if there's something that I said wrong, correct me --

A. No, I --

Q. -- or if I've left something out, correct me.

A. I don't know if that's exactly how it was said or -- I know -- I believe if -- if I'm not mistaken, I believe that at one point in time -- when they came and talked to me about it, I believe at one point in time I was told to contact them later on.

Q. Okay. Told to contact them if you had any information --

A. Yes.

Q. -- or you wanted to talk about it anymore?

A. Yes, I believe so.

Q. I know you may not remember, but it's really important for us to try to figure out who "they" are. So you don't remember the names?

A. I don't remember the names.

Q. Do you remember --

A. I didn't even remember my lawyer's name until . . .

Q. Do you know how many times you actually had a visit from a detective or detectives regarding the Reverend's murder?

A. Probably three times. The first time when they told me about it. I believe the second time maybe when I possibly contacted them, and just before court.

Q. And you're saying "they." So was it always more than one person?

A. The first time it was one person. The second time it was a man and a lady.

Q. The second time a man and a lady.

And then the third time is when you talked to the prosecutor when you went to court?

A. When we went to court, yes.

Q. So that was at the holdover cell?

A. Yes.

Q. And that was the prosecutor, you think?

A. I believe, yes.

Q. And the detective?

A. Yes.

Q. Do you know -- and your lawyer maybe?

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

A. No.

Q. Would your lawyer have been there?

A. No, he wasn't there.

Q. And you're sure about that?

A. It was -- Scottie Allen was my lawyer.

Q. But you're saying you remember he wasn't there?

A. No, he wasn't there.

Q. Do you have any -- and this is a long-shot, but I'm going to ask you anyway.

Do you have any kind of visual memory of what any of these people looked like to where you could describe the detective or anything like that? If not, that's okay. I understand.

A. No.

Q. Okay.

A. But they have records in all the legal systems.

Q. Yeah. You know we are trying to get yours, and for some reason the jail can't find those. So that's why I'm asking real detailed questions, to try to figure out who and when. Yeah, yeah.

A. Because you have to sign who you talking to, how long the visit goes.

Q. Right. So the first time one person came to see you?

A. Yes.

Q. And your memory is, as a result of that visit, then what you did is you reached out to them?

A. Yes.

Q. And then the second time, because you reached out, they came back and then it was a man and a woman?

A. Yes.

Q. And then the third time was over at the court --

A. I believe that may be how -- I believe maybe -- I believe probably I had Ysekia contacting them. Not telling her anything, but just letting her know, "Hey, call him and tell him I need to talk to him."

I believe that may be -- because you can't -- and you have to call collect. You can't call anybody collect. I don't think I wrote him.

Q. I think you wrote him a kite. I think you sent him a kite. And in the kite -- because it was introduced during the trial. That's why I'm saying it was a kite.

A. Okay.

Q. And in the kite you just said you wanted to see the investigator, and you named him and it was Investigator Berry. Does that ring a bell?

A. I mean, if that was it, it had to be. But I don't remember it.

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

Q.   Possibly you could have been both.  You could have sent a kite out, and Ysekia could have contacted him as well?

A.   (Witness nodded head.)

Q.   Because you reached back out to them, did you do that because you had decided, "Yes, I have some information, and I want to try to help with the murder investigation," or do you remember?

A.   No, I don't.  Like I said, it was -- it was -- in the beginning it was all because of everybody in that area being a business owner and not into illegals.  So, I mean, to me it wasn't rolling over on anybody.  I'm a business owner, just like he is, on the same block.  And if something happened in my business, I would expect my building mate to do the same for me.

Q.   Is it possible that what happened was they came and talked to you about it and asked if you had any information, and because you cared about Reverend Borns, you then decided, "Hey, I'm going to talk to Dennis Allen and see if I can't get any information from him"?

A.   Yeah.  Because before that I had already spoken with him a few times about -- you know, just sometimes when we get locked up, you just talk about what's going on with y'all, you know.  And then if somebody else asks about it, you say:  Well, I kind of remember this and

that.

Q. So to be clear, you're saying you had talked to Dennis Allen about the Reverend's case --

A. Yes.

Q. -- before the detective ever came to see you?

A. Yes.

Q. Okay. So it's real important for us to know, if you remember, during those conversations with Dennis Allen, did Dennis Allen tell you that he was involved in the murder at all?

A. No.

Q. In any way?

A. No.

Q. So do you remember what you talked to Dennis Allen about in regards to the crime?

A. He was saying what he'd been accused of, and we were talking about -- because we were in a mutual area -- you know, in the same area. And he brought it to my attention, you know, "Hey, my case's got something to do with this guy here." Really no specifics. I can remember very well that he didn't give me any specifics about doing anything.

Q. So you talked to him, and then you talked to the detectives?

A. Yes.

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

Q. And then you decided you were going to talk to Dennis Allen some more to see if you could get some information?

A. Yes.

Q. When you talked to him to get more information, at that point did Dennis Allen tell you that he had been involved in the crime at all?

A. No.

Q. So then after you talked to Dennis Allen some more is when you sent a kite to the detective saying, "I want to talk to you"?

A. I believe so.

Q. And you do or do not remember why you wanted to talk to the detective at that point?

A. No. I don't exactly remember how or what it was that I felt like that lined up or whatever, but I know that --

I don't know, maybe he -- maybe at one point in time he told me something that I -- I just -- I would be lying if I tried to tell you the specifics.

Q. Right. Right. And I don't want --

A. And I'm not sure of that, you know. Because I know the feeling now, and I know -- I know what was caused. I know the reaction behind everything.

Q. I'm trying to figure out if it's possible that

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

maybe Dennis Allen had said something to you to at least make you believe he might have been involved --

A. No.

Q. -- in the murders.

A. No.

Q. No?

A. No.

Q. Okay. So is it possible then that what you started figuring out was that maybe you could work a deal on your case?

A. I just saw the picture they painted of me -- I just saw the picture they painted of him for me about this preacher who owned a business, just like I owned, on the same block.

Q. So originally you're just thinking you want to help try to solve the murder of this guy?

A. Yes.

Q. But at some point that changes and it turns into testifying and giving a written statement --

A. Yes.

Q. -- against Dennis Allen, right?

A. Yes.

Q. Any idea when that changed or why?

A. He just -- I remember -- I remember when we went to -- just before court he said, "Hey, instead of

Electronically signed by Karen Schoeve (001-182-274-8899)     89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

going through all this right here, this is basically what was said or what needs to be said," you know. And it was written down -- and it was like all morning -- like on a regular piece of paper. "This is to go around everything that was talked about or however. Basically this is, you know, what you think took place," or "This is what, you know, needs to be said in court."

Q. I guess I'm just thinking -- and you're not -- you're not saying it, and maybe it's because it didn't happen, but I'm just -- at some point, if I understood you and how you talked to Gary, at some point you started thinking -- or at least having a conversation with the detective about what you could get for you if you testified --

A. Yes.

Q. -- against Mr. Allen?

A. Yes. He told me that my case would be all right.

Q. Okay. And do you -- I want to try to get as many details, if you have them, about when that was.

Was that not the first meeting?

A. No, it was actually the second meeting --

Q. The second meeting, okay.

A. -- with the woman.

Q. With the woman and the man.

A. Yes.

Q. And you're the one that basically initiated that second meeting?

A. Yes.

Q. Okay. And somehow or another during that meeting is when they say, "Hey, look, if you tell us something regarding Dennis Allen, we'll help you out on your case"?

A. Yes.

Q. And you, at that point decided, yes, that's what I want to do?

A. Um-hum.

Q. Okay. And do you recall if that's when you wrote out that long statement that you gave against Dennis Allen?

A. I believe so.

Q. Do you remember the detective or the prosecutor talking to you about how they could help you with your case?

In other words, how were they going to work that? Were they going to say, "Okay. We'll tell you before you testify that we'll give you X number of years in prison or probation," or did they say "We're not going to talk specifics now. We're just telling you that if you testify truthfully, we'll help you on the

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

back end"?

Do you understand what I'm saying? I'm just trying to get a feel for how that conversation was communicated.

A. There's somebody named Bill Hunt whose name was involved in that?

Q. I don't know. I don't recognize that name, to tell you the truth. I'll write it down and I'll check it out. Tell me why that name's coming to your mind and what you're thinking.

A. Because he was a private investigator, I believe, or he was an investigator. I don't know. Maybe he was Scottie Allen's investigator or something. I don't know why I remember that name.

MS. CUMMINGS: Was there a Bill Hunt that was an investigator in the DA's office? Do you know?

MR. HAMMOND: Could have been the investigator.

MS. CUMMINGS: Could have been the investigator for the DA?

THE WITNESS: It was a black guy --

MR. UDASHEN: He was, but I'm not sure when he left.

Q. (BY MS. CUMMINGS) Okay. So tell me what you're thinking.

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

A.  I'm trying to remember if that was the person.

Q.  **That you talked deal with or details or how you could benefit from testifying against Mr. Allen?**

A.  Because it was somebody that told me, "Hey, these are people that are going to make sure things are going all right with you, you know.  But I don't remember who that name is.

Q.  **We'll check it out, and try to find out.  Thank you.**

**So that name pops in your mind, but you don't remember who or --**

A.  No.

Q.  **-- any other specifics about how it happened?**

A.  No.

Q.  **Gary asked you a little while ago about whether or not you have ever worked with the cops or the prosecutor in other cases.**

A.  Um-hum.

Q.  **And I believe you told him, no, except for the one case in 2008/2009, when you were the videographer, right?**

A.  Yes.

Q.  **I want to ask you, I think that there may have been something else that you worked with the cops on prior to Dennis Allen's case.**

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

Do you remember Detective Triple with DPD?

A.   Hum-um.

Q.   There's a note in your file -- and this is in your burglary of a habitation file that was pending at the same time as the Dennis Allen case.  There's a note in your file where DPD, or Detective Triple, is saying that they needed to talk to you because they were going to show you a photo line up to clear a murder.

So do you remember knowing anything else about another murder --

A.   No.

Q.   -- prior to the Reverend's murder?

A.   No.  I got shot at, and they came and asked me if I could identify the people that shot at me.  And they said they had a guy that was locked up; that was in the Abilene area or something, and me and my brother got shot at.

Q.   Okay.

A.   My brother got shot.  We were in a car together and my brother had got shot, and that's what that was about, because they had said that they had arrested somebody else --

Q.   Your brother was killed?

A.   Joseph Osteen.

No, he wasn't killed.  He just got shot.

Q. I just wonder, this is talking about regarding a murder.

A. They said that they had a guy for a murder case, and that -- they said these same people fit the description of when we got shot up down the street from my club, and was that the person.

Q. And when was it that you and your brother got shot at?

A. That was in late '90s.

Q. '98? '99?

A. '98, '99, somewhere in there on Pennsylvania and 4th Street. Somebody just pulled up and just started shooting at the car.

Q. Another -- I'm going to shift over to a totally different subject.

Another area that I'm kind of confused in my mind about is all of the information about the knife or the supposed weapon that was used to stab Reverend Borns; do you remember talking to the DA or the prosecutor about that?

A. I know I did, but I don't remember exactly what was said. I remember them telling me about some things that was taken from the shop. I believe they said a phone was taken. I don't remember exactly everything.

Q. You actually said in your written statement

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

that -- it seemed that there was some confusion. When you were saying Dennis Allen confessed to you about the crime, there was some confusion about whether or not he used a knife or some other tool or object.

A. Yes.

Q. So you do remember that?

A. Yes, I do; vaguely.

Q. And do you have any memory -- I understand you just said "vaguely," about why there was some question about whether or not it was a knife or some other object?

A. Maybe -- I think probably because something was found on the roof or -- I don't know. I don't know exactly.

Q. You --

A. Mostly all of the information that I really relayed in court was information that I got from them.

Q. From the detective?

A. Yes.

Q. And the woman -- and I'm assuming it was a female detective.

A. Yes.

Q. Do you remember watching any of the television coverage about the case?

A. No.

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

Q. And I was asking back at the time, so back in 2000. You don't remember any of that?

A. No.

Q. Do you remember watching any television coverage about Dennis Allen or Stanley Mozee in the last year or two?

A. From now? No.

Q. Gary asked you if you had talked to Dennis Allen since you've been in prison.

A. No.

Q. Actually I think he asked it broader than that.

Have you talked to Dennis Allen at all since you testified against him?

A. No.

Q. Nor have you talked to Stanley Mozee.

A. No.

Q. Have you --

A. I don't know if I've ever laid eyes on Stanley Mozee.

Q. Okay. What about letters or any other types of communication?

A. No.

Q. I just want to be real clear, because somebody may read this and say "Yeah, you said you never talked to him," but maybe you were writing them letters.

A.   No.

Q.   Or they were writing you letters.

A.   No.

Q.   Okay.  So let me ask you this:  Did you talk to anybody else about Dennis Allen or Stanley Mozee's case?

A.   No.

Q.   So nobody has asked you to change your story --

A.   No.

Q.   -- and try to help them?

A.   No.

Q.   So you now say that you lied when you testified against Dennis Allen?

A.   Yes.

Q.   And the bottom line is you're saying it was not truthful to say that Dennis ever confessed to you about the crime?

A.   Yes.

Q.   I want to try to understand, if you lied then, why are you now coming forward in response to Gary's meeting with you a couple of weeks ago saying that you lied?

A.   My case is solidified, so there's no help for me, and I've been lied on and I know how it feels.  At the time I was involved in doing what I thought was supposed to be the right thing.  And, you know, that's

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

just how that happened at that moment.

But, yeah, I now know the significance of it and the impact that my statement alone may have caused on that man.

Q. Can you think of anybody that I should talk to that would support the truth as you say it today, that he never confessed to you about the crime, that you never got --

A. Anybody that was in the tank -- anybody that was in the tank with us at that time. We never really had a secluded conversation, so all of the conversations we'd always have was room conversations or three or four people talking, so . . .

Q. What about anybody in the free world that might know something?

A. Well, I think it would be easier to find somebody that was in the tank because you have a record of who was on the tank with us.

Q. Anything you can think about regarding -- regarding the deal that you ultimately got? Because it's kind of confusing trying to piece things together, and I'm going to show you a couple of things when I ask you some questions about it.

So what I have here, Mr. Robinson, is I've got copies of paperwork from your burglary of a

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

habitation court file.  Do you understand what I'm talking about?

A.  Um-hum.

Q.  And you were saying you were having a hard time even remembering who your lawyer was, right?

A.  Um-hum.

Q.  But ultimately you figured out it was Scottie Allen.

A.  Scottie Allen.

Q.  And actually Scottie Allen was the lawyer that took your case to trial where the mistrial happened, right?

A.  Um-hum.

Q.  And then according to this paperwork, it looks like what ends up happening is you get a different lawyer after Scottie Allen.  Do you remember that? William Hughey?

A.  I know I had another lawyer, but I don't remember his name.

Q.  Okay.  And you're -- you don't remember details about what kind of deal they were going to give you for --

A.  No.

Q.  -- for testifying about Mr. Allen?

A.  No.

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

Q.   I think what you said in response to Gary is you remember that there had been a plea bargain offered of maybe like six years to do and then it changed to probation.

A.   Yes.

Q.   Do you remember what the original plea bargain offer was in your case prior to going to trial and having the mistrial?

A.   No.  I remember -- no, I don't remember what the original plea bargain was.

Q.   I'm going to ask you to look at this.  This looks like something you wrote and you submitted to the Court.

Just so you get kind of a time frame, according to the written statement you gave against Dennis Allen, that happened in July of 2000.  And then Allen's trial was in August of 2000.  And what I'm showing you is a letter that you wrote on October 1st in 2000.

A.   (Witness examined document.)

Q.   I'm wondering if this helps you remember what happened as far as getting the probation deal that you got.

A.   (Witness examined document.)  I don't remember.

Q.   You don't remember that?

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

A.    (Witness shook head.)

Q.    Do you remember what day you actually did the deal and pled and got the five years probation?

A.    No.  No, I don't.

Q.    Do you remember if it was close in time to when you testified against Dennis Allen?

A.    No, I don't.  I really don't.  It would have -- it would have to have been -- it would have to have been close in order for me to get out -- get probation and get out.

Q.    Close to the time?  Is that when you're saying, it would have had to have been close to the time?

A.    Yeah.

Q.    Do you -- I'm just about done.  I've taken longer than I told you I would and what I told everybody else.

A.    No, no problem.

Q.    But I wanted to end on one last subject; and that is that last time, the third time that you said you had conversations --

A.    In the court holdover.

Q.    -- in the court holdover, yeah.  I want to just make sure that there's not something else you remember about that conversation that you haven't told us.

So basically what you've already said is it

was in the holdover, and it was the prosecutor and the detective, right?

A.   I believe so.

Q.   And what you said was the prosecutor was just basically going over with you how it would work as far as your testimony?

A.   Yes.

Q.   What kinds of questions he'd ask?

A.   Yes.

Q.   And you said how you were supposed to answer.

A.   Yes.

Q.   Are you sure he was telling you how to answer the questions?

A.   Well, he was telling me something like:  If I'm not spoken to, don't say anything more than I have to. When he says something, he's going to be in reference to this, pointing at the document or the statement or whatever.

The statement that he gave me to read over wasn't the statement I believe that I wrote at first.

Q.   Do you remember if he -- so he's telling you basically what lawyers do a lot of times, which is try to prepare people for how to answer questions in the courtroom.

A.   Yes.

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

Q. Do you remember him saying to you, "Okay, Mr. Robinson, you're going to get asked the question from the defense lawyer for Mr. Allen, whether or not you have a deal."

A. Yes.

Q. Do you remember whether or not he talked about that?

A. Yes.

Q. And do you remember if he told you how to answer that question?

A. "They hadn't offered you anything and you have no deal." And I don't remember how it went or the wording, but something of that nature, you know.

Q. And --

A. I think that's the reason why he couldn't or wouldn't tell me then, specifically, that it would be probation.

Q. Okay. Do you remember him saying anything to you about, "I just want you to testify truthfully, and if you do, then we'll talk about how I can help you on your case"?

A. Yes, something like that.

Q. So when he told you that if you were asked if you had a deal, and you should say "no" --

A. Yes.

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

Q. -- did you go into the courtroom and testify and answer that question the way he told you to?

A. Yes.

Q. Did you think that when you were saying to the jury in Dennis Allen's trial that you did not have a deal, did you think you were lying then or telling the truth?

A. I knew that it was a lie.

Q. Why?

A. I mean, because it was -- it's just kind of like you have to say certain things a certain way, but an understanding has been made.

Q. And so it's kind of like a "wink/wink"?

A. Yeah.

Q. You know, "I can't tell you exactly what it is, but basically our deal is . . ."

A. It's gonna be all right.

Q. Okay. And that was information you got from the prosecutor during that conversation in the holdover?

A. Yes.

Q. And did you get that information from any of the detectives in any of the other visits, like the second visit when it was the male detective and the female detective?

A. I don't know. I think at one point in time

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

somebody said they knew somebody in my court or worked
close with somebody in my court, something like that.

Q. Yeah. I think you said something to Gary about
that in the beginning.

A. Yeah.

Q. And I know you're have having a hard time
remembering your lawyers, but do you remember ever
talking to one of your lawyers about, "Hey, they're
going to help me out on my case because I'm testifying
against Dennis Allen"?

A. No, I don't.

Q. Okay. Do you have any questions about anything
I've asked you?

A. No.

Q. Anything else you can think of that you think
we, as the Conviction Integrity Unit, needs to know
about Dennis Allen's case and your involvement in it?

A. No, not other than just that, you know, I had
no knowledge of it. You know, I accepted the picture
that they painted to me of him.

Q. So do you know -- so if you're accepting the
picture that the detectives and the prosecutor painted,
as you sit here today, do you know whether or not Dennis
Allen participated in any way in the murder of
Reverend Borns?

A.   No.

Q.   You don't know?

A.   No.

Q.   Do you know anybody who did participate?

A.   No, ma'am.

MS. CUMMINGS:  Thank you, Mr. Robinson.
That's all the questions I have.

MR. UDASHEN:  I'm just going to ask you a
few quick questions.

FURTHER EXAMINATION

BY MR. UDASHEN:

Q.   Bill Hunt that you mentioned, do you remember
what he looked like?

A.   I remember he was a black guy.  I don't know --
I don't know why his name came to my mind, but
I would -- it just seems like that I spoke to him about
something.

Q.   Okay.  But he may have been defense
investigator, or he may have been a DA?

A.   I know he was a investigator.

Q.   You don't know who he worked for?

A.   No.

Q.   Okay.  And the thing about people throwing
stuff up on the roof over in that neighborhood --

A.   Um-hum.

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

Q. -- it sounds to me like what you're saying is that if the police go look on the roofs in that neighborhood and during that time period, they're --

A. You can probably go now and find something up there.

Q. I mean, there might be knives or drugs. There's all kinds of stuff people throw up there.

A. Yes. In a lot of those instances, when you go behind some of those buildings, there's nowhere to go.

Q. So people throw stuff on the roofs?

A. Yeah.

Q. Okay.

A. They'd rather throw something on the roof than get caught. Back then it wasn't easy. Most of the business owners hustled like that.

If I know that you ran behind my building and you threw something on the roof, and it's probably something expensive and the police come and ask me, can they go check. No, I'll go check for them.

Q. Okay.

A. And no, I didn't find anything, whether if I did or not.

Q. Okay. But you know that there's been knives up on the roofs before?

A. Yes.

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

Q. Okay.

MR. UDASHEN: That's all the questions I have.

MS. CUMMINGS: Ask him about Keith Thomas and (inaudible).

MR. UDASHEN: Oh, yes.

Q. (BY MR. UDASHEN) So Keith Thomas was your partner?

A. Yes, at one point in time we were club owners.

Q. And Keith, during the time period that you were in jail while this case was going on --

A. He was running the club.

Q. -- Keith was running the club.

A. Yes.

Q. So he knows all this same kind of stuff about what's going on in the neighborhood there, about people throwing stuff on the roof?

A. Yes. He would know the same -- he would know the same stuff. But me and him never talked about this issue, but he would know the same, yeah.

Q. Okay.

MS. CUMMINGS: Is he around?

Q. (BY MR. UDASHEN) Yeah, have you seen --

A. I haven't heard from him or anything about him in years.

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3

**MS. CUMMINGS:** Do you know his middle name or anything like that?

**THE WITNESS:** No.

**MS. CUMMINGS:** Keith Thomas is so just common. I wonder if we could try to find him.

**THE WITNESS:** His name was -- actually his name was on the lease of the building first.

**MS. CUMMINGS:** Has he ever been in any trouble with the law?

**THE WITNESS:** I think he's been to the federal penitentiary before.

**MS. CUMMINGS:** Thank you.

**MR. HAMMOND:** Do you know where he stayed?

**THE WITNESS:** No.

**MS. CUMMINGS:** That's all I have.

**MR. UDASHEN:** That's all I have, too. We're done.

**MS. CUMMINGS:** Thank you.

**MR. UDASHEN:** Thank you. You take care.

(Concluded at 11:15 a.m., December 4, 2015.)

STATE OF TEXAS          )
                        )
COUNTY OF DENTON        )

REPORTER'S CERTIFICATE

I, Karen L. D. Schoeve, Certified Shorthand Reporter, Registered Diplomate Reporter, Certified Realtime Reporter, and Realtime Systems Administrator, residing in the State of Texas, do hereby certify that the foregoing proceedings were reported by me and that the foregoing transcript constitutes a full, true, and correct transcription of my stenographic notes, to the best of my ability.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which these proceedings were taken. Further, I am not a relative nor employee of any attorney of record in this cause, nor do I have a financial interest in this action.

Subscribed and sworn to on this the 16th day of December, 2015.

Karen L. D. Schoeve, CSR, RDR, CRR
Realtime Systems Administrator
Texas CSR No. 3354
Expiration Date: 12/31/16
Amy Massey & Associates
Firm Registration No. 404
6724 Kirk Lane
Burleson, TX  76028
T: 817.447.6721
F: 817.447.6491
masseyreporters@earthlink.net

Electronically signed by Karen Schoeve (001-182-274-8899)          89a36353-ab7e-4e7e-96bb-9ca59d1a2eb3